WILLIAMS, Circuit Judge.
In Elliot Don Ray’s first federal habeas appeal we found that his constitutional rights were violated when the state introduced out-of-court statements made by individuals who did not testify at his murder trial. But we remanded to give the state the opportunity to assert a defense that Ray’s state post-conviction motion was untimely. Ray v. Boatwright (Ray I), 592 F.3d 793, 798-99 (7th Cir.), as amended (Apr. 1, 2010). On remand, and after an evidentiary hearing, the district court placed the burden of proving timeliness on Ray, finding that he did not timely give his state post-conviction motion to a prison official for mailing, and dismissed the petition.
On appeal, Ray argues that the district court erred by placing the burden of proof on him, by not requiring the state to put forth an affirmative case of untimeliness, and by not applying the mailbox rule, which supported his position that his state post-conviction motion had been “properly filed” for the purpose of tolling AEDPA’s limitations period. The state asserts that the mailbox rule does not apply because the state procedural rule under which Ray challenged his conviction does not have a timeliness requirement, and even if the mailbox rule does apply, the petitioner— not the state — bears the burden of proof, and that Ray did not carry his burden. We disagree and adopt the rule set forth by the majority of our sister circuits that the prisoner mailbox rule governs whether a state post-conviction document is “properly filed” under the AEDPA limitations period unless the state has clearly rejected it. Because Wisconsin has not clearly rejected it, the mailbox rule applies in this case.
Having so found, we address the second issue, which is who has the burden of proof. Where a pro se prisoner’s filing is not received by the state court, the habeas petitioner must produce some evidence to support his sworn statement of timeliness, and if this showing is made, the burden shifts to the state to prove untimeliness. Applying these rules to this case, we find that the state failed to present competent evidence contradicting Ray’s testimony and documents showing that he timely gave his state post-conviction motion to a prison official for mailing. The district court’s finding of untimeliness was clearly erroneous because it ignored this lack of evidence and was based on nothing more than conjecture and speculative doubt, allowing the state’s conclusory arguments to carry the day. We therefore reverse and remand with instructions to grant Ray’s habeas petition unless the state elects to retry him within 120 days.
*996 I. BACKGROUND
As we detailed more thoroughly in our previous opinion, Ray was convicted in Wisconsin on state counts of reckless homicide, party to a crime, and recklessly endangering the safety of another. Ray I, 592 F.3d at 794-96. His conviction resulted from a retaliatory shooting on 29th Street in Milwaukee, Wisconsin that left an eleven-year-old girl dead and two other people injured. At Ray’s criminal trial, the state called Detective Daniel Phillips to describe a signed statement that Ray gave during his interview with police. The detective primarily read from Ray’s statement. But he also recounted his own out-of-court statements informing Ray that two co-actors had implicated Ray in the shootings. Detective Phillips testified:
Ray was then confronted with numerous statements made by co-actors that they were present [at the] shooting on 29th Street and so was Ray.
Ray then stated “those stupid niggers shouldn’t be talking and they can’t talk for me.”
When confronted with statements by [Miriam Myles] that Ray was shooting a nine-millimeter on 29th Street [and] in a statement by Sylvester Townsend ... that Ray had a .45-caliber pistol[,] Ray then said “tell me which gun killed the girl and I’ll tell you everything.”
Neither Miriam Myles nor Sylvester Townsend testified during Ray’s trial. But defense counsel did not object to this incredibly damaging testimony. After his conviction, Ray raised five issues on direct appeal, including a claim that Detective Phillips’s testimony violated his right to be confronted with the witnesses against him. The state appellate court ignored this claim, decided that Detective Phillips’s testimony was not hearsay because it was not offered to prove the truth of the matter asserted, and affirmed Ray’s conviction. The Supreme Court of Wisconsin denied Ray’s petition for review on June 12, 2003.
Ray then sought state post-conviction relief under Wisconsin Statute section 974.06. That statute provides: “After the time for appeal or postconviction remedy ... has expired, a prisoner in custody ... claiming the right to be released upon the ground that the sentence was imposed in violation of the U.S. constitution ... may move the court which imposed the sentence to vacate, set aside or correct the sentence.” Wis. Stat. § 974.06(1). Importantly, a section 974.06 motion for relief “is part of the original criminal action, is not a separate proceeding and may be made at any time.” Id. § 974.06(2). Ray’s request for relief under section 974.06 was eventually denied on October 16, 2006.
Ray filed two separate pro se petitions for writ of habeas corpus in the federal district court on February 28, 2007. The district court summarily dismissed Ray’s petitions, exercising its authority under Rule 4 of the Rules Governing Section 2254 Cases,[1] finding that Ray did not set forth a cognizable constitutional or federal law claim. But the court granted Ray’s request for a certificate of appealability to resolve Ray’s confrontation clause claim. On appeal, we held that “the evidence presented by the prosecution delivered to the jury statements by named co-actors, not available for cross-examination, accusing Ray of the very crimes with which he stood charged” and “the evidence was a *997 clear violation of Ray’s constitutional right of confrontation.” Ray I, 592 F.3d at 795-96. The state petitioned for rehearing en banc, raising a timeliness defense. We denied the petition, but on April 1, 2010 we issued an amended opinion remanding this case to the district court “so that the government may have an opportunity to develop the record on this issue” because the record contained “no evidence ... to support the government’s assertion” of untimeliness. Id. at 799.
On remand, the district court held a status conference to decide how to proceed. The state did not request additional discovery or alert the district court of any difficulties it had experienced in obtaining relevant evidence. The state filed a motion to dismiss Ray’s petition as untimely. Ray countered with a motion for summary judgment. After reviewing the parties’ briefs, the district court denied both motions, scheduled an evidentiary hearing, and ordered Ray to testify in support of his claim that “the mailbox rule exception to the statute of limitations defense applies.” The court also ruled that Ray bore the burden of proving that his petition was timely.
The record before the district court, as it existed prior to the evidentiary hearing, included Ray’s sworn affidavit detailing his claim that on April 27, 2004 he gave his section 974.06 motion to Ms. Tamara Smith, a Diamondbaek Correctional Facility social worker. Ray averred that he gave Ms. Smith the motion, with prepaid postage, for mailing to the Wisconsin Circuit Court of Milwaukee County. He maintained that Ms. Smith, in turn, gave him two receipts: a “Certifícate of Service by Mail” receipt, which he signed, and a “CCA Privileged Correspondence Receipt,” [2] which she signed. Ray’s affidavit also described his efforts to obtain information from Ms. Smith regarding the processing of his mail. On June 1, 2004 and September 9, 2004, Ray wrote letters to Ms. Smith asking her to verify that she sent his section 974.06 motion to the court. He then wrote her a third letter on June 15, 2005, requesting the same information. Finally, according to Ray, after not hearing back from Ms. Smith, he sent a notarized letter to the Milwaukee clerk of court on October 4, 2006 to determine the status of his motion. The court informed Ray that it had no record of his post-conviction motion ever being filed, so he immediately submitted a supplemental pro se motion, which the court denied on October 16, 2006. The pre-evidentiary-hearing record contained no evidence contradicting Ray’s sworn testimony.
On July 28, 2011, the district court held an evidentiary hearing. Before beginning, the court clarified that even though the general rule is that the party asserting an affirmative defense, like untimeliness, bears the burden of proving the defense, Ray had invoked an exception to the defense so the burden rested with him to prove that the exception applied. The court noted that Ray “has made the required presentation of sufficient evidence ... to conclude that he has raised [the mailbox rule] issue.... [T]he state disputed it, not based on specific facts but inferentially, they argued that the evidence he has supporting his position is not credible. I have concluded that we need a factual hearing on that.” The hearing, according to the court, was conducted to “assess [Ray’s] credibility.”
The evidentiary hearing began with testimony from Corrections Officer John T. Nedbal. He worked in the library of New Lisbon prison, where Ray was incarcerated .when he allegedly lost the signed CCA *998 receipt after giving it to the prison library staff for photocopying. Officer Nedbal quoted the library policy as requiring inmates to “identify^ ] material to be copied,” which he understood to mean that inmates were expected to describe precisely what they wanted copied. Officer Nedbal testified that he would “look [ ] over” the descriptions and instructions provided by the prisoner and then “send it to ... get their copies,” but if he noticed anything “suspicious” about the materials submitted he would talk.to the prisoner and contact a supervisor if necessary. Officer Nedbal explained that he was only permitted to “glance” at a prisoner’s “legal stuff,” so he did not read prisoners’ legal materials. He stated that he had “glanced at” the disbursement form Ray provided with his copy request. That form contained a “reason for request section,” in which Ray wrote, “Two copies of a Corrections Corporation of America Privileged Correspondence Receipt form.”
On cross-examination, Officer Nedbal explained that Ray’s copies were, to his knowledge, the first requested copies that had ever been lost during the three years that he worked in the library. He agreed that the only basis for believing that the copies had been lost was Ray’s claim that he did not receive them. Other than the “photocopy request,” which served as a de facto receipt for prisoners and the prison, Officer Nedbal had no other means of verifying that Ray’s original document and requested copies had never been delivered.
Ray then called Lynn Martin to testify. Ms. Martin served as the librarian at New Lisbon since the fall of 2007. She explained that she would have screened the documents that Ray submitted for photocopying and flagged anything that looked suspicious for a supervisor’s review. According to Ms. Martin, if the materials “went over to be copied” then she did not notice anything suspicious about them. Ms. Martin admitted that she was not aware of any other prisoner’s copies being lost, but she said that the only way the library would know is if the “inmate came and let us know.” In her opinion, the prison would not have taken steps to look for the copies — including circulating an internal memo, and interviewing individuals who were responsible for the copying — if Ray’s copies had never been made. Ms. Martin stated that she checked the “lost in mail” option on an information request form she received because she believed that the photocopies were made and there was no evidence that Ray actually received them.
During her cross-examination, Ms. Martin explained that she would identify a document as suspicious if it “had someone else’s name on it,” but she also looked at “various other” indicators of suspiciousness. She said she believed Ray’s documents were lost because his request was not flagged as suspicious and he claims to have never received the documents. The prison did not have an internal tracking procedure to verify receipt of requested copies, nor did it require prisoners to sign any type of receipt upon delivery. Looking at library records, Ms. Martin confirmed that an inmate with the initials “AS.” completed Ray’s photocopy request on April 19, 2010. Finally, Ms. Martin testified that Ray had previously worked in the library between February and September 2008.
On redirect, Ms. Martin corroborated Officer Nedbal’s statement that prisoners were required to detail what they wanted copied, not just the number of copies they were requesting or their preference for how the copies would appear (e.g., double-sided, scaled, etc).
The state solicited testimony from Michelle Highley, a financial specialist at *999 Green Bay Correctional Institution since September 2009. Her responsibilities included maintaining records on inmates’ trust accounts. Inmate trust accounts show purchases made during incarceration. Ms. Highley testified that Ray’s account did not show any purchases between April 1 and June 14, 2004, so if he sent mail during that period, as he claims he directed Ms. Smith to do, he did not purchase the envelopes or postage from the prison’s “commissary.” Ms. Highley conceded, on cross-examination, however that Ray might have purchased those items before April 1, borrowed stamps and envelopes from other inmates, or received them by mail from family members. On redirect, Ms. Highley testified that Ray had been transferred to Green Bay Correctional Institution on April 30, 2004 and he had “zero” dollars “cash on arrival.” Ms. Highley did not dispute that he might have previously purchased stamps or obtained them by alternative means.
Ray served as the final witness at the evidentiary hearing. He began by reaffirming the veracity of his previously submitted affidavit. He explained that in April 2004 he was incarcerated at the Diamondback Correction Facility in Oklahoma. Diamondback did not have a separate system for legal mail; inmates could give legal mail to the prison officials or put it directly in the regular mail. Ray explained that on April 27, 2004 he did not have access to the regular mail system because his prison unit was on “administrative confinement,” so prisoners were prohibited from leaving the unit. During lunchtime, Ms. Tamara Smith, one of the prison’s social workers, “came in the unit.” Seeing Ms. Smith, Ray .“stopped eating went upstairs to [his] cell, grabbed [his] ... manila envelope with [his section] 974.06 [motion] in it and brought it downstairs” to give it to her. After telling Ms. Smith that he needed her to send “legal mail” on his behalf, Ray and Ms. Smith went into “the social worker office” where she proceeded to look through the cabinets before finding and giving Ray two forms to complete. The first form, according to Ray, was a certificate of service by mail. The second was a CCA privileged correspondences receipt, which Ms. Smith allegedly signed.
Ray testified that he had been relying on fellow inmates for help with his legal affairs and that he did not produce the CCA receipt initially because one of those inmates had it when the inmate was transferred to another prison. Ray testified that, relying on the advice of other inmates, he only followed up with Ms. Smith — and not the state court directly— because he was concerned that the court might get irritated and summarily dismiss his petition. Ray allegedly sent Ms. Smith three letters to obtain information about his post-conviction motion, the first on June 1, 2004, the second on September 9, 2004, and the last on June 15, 2005. He retained copies of each. But after not hearing back from Ms. Smith for nearly two years, Ray decided to contact the state court directly. He claims to have waited so long because he thought there might have been some sort of delay in his mail reaching Ms. Smith: “staff members in other institutions ... [t]hey get a letter ... from an inmate, they’ll put it to the side until they keep piling up____” So in October 2006, Ray sent a notarized letter to the Circuit Court of Milwaukee County requesting information about the status of his section 974.06 motion. After being informed that no such motion was received or pending, Ray filed a supplemental section 974.06 motion, which the court denied on October 14, 2006. Ray subsequently sent Ms. Smith a letter on November 1, 2006 asking about his original motion and explaining that the court had never re *1000 ceived it. He also wrote the warden to complain about Ms. Smith’s mishandling of his mail.
According to Ray, after we issued our opinion in April 2010, he began reaching out to try to find the inmate who had his CCA receipt. After finally tracking down the receipt, Ray sought to make copies for himself and his recently retained attorney. However, the prison library failed to deliver his requested copies and did not return his original document. So Ray sought advice from Ms. Martin. She apparently knew about Ray’s case because she “call[ed] him down to the library to show” him on “LexisNexis the decision” we issued in April 2010. Ray explained to Ms. Martin that he thought it was extremely important to find the document.
The state confronted Ray with Diamondback’s “Communication Mail and Visiting” policy, which had been in effect during April 2004. Section 6(a) of the policy states: “All inmate mail will be processed through the institutional mailroom. No person, either staff or visitors, is permitted to bring in or take out any mail or article for an inmate.” Ray maintained that he could not take mail to the mailroom because his unit was on administrative confinement, and despite the written policy, inmates were allowed to give mail to the prison officials. Although the policy said nothing about receipts for outgoing privileged mail — but it did describe such receipts for “incoming” correspondences— Ray swore that Ms. Smith gave him a receipt for his outgoing mail. Pointing to the prison mail logs to buttress his claim, Ray testified that all outgoing legal mail was supposed to be logged, prisoners do not have access to the mail logs, and the prison refused to produce (or submit into evidence) logs from the relevant dates, including the date he gave his motion to Ms. Smith.
The district court offered both sides an opportunity to make closing arguments. Ray’s counsel summarized Ray’s evidence and argued that “[f]or the State to prevail in this situation, you have to believe that in October 2006, Mr. Ray had figured out ... AEDPA and the tolling provisions ... then began to manufacture evidence in 2006 ... to deal with the federal petition that had not even been filed assuming that a State petition, which he had just found out had not been received, was going to be denied. It is an extraordinary amount of prescience on the behalf of Mr. Ray who, until recently, did not even have his [general equivalency diploma].”
The state closed by raising a series of questions about Ray’s version of the events. It began by refuting a suggestion by Ray’s counsel that it had been derelict in obtaining evidence from Diamondback. Counsel explained, “I have made numerous phone calls to CCA ... [and have been] met with voicemails and unreturned calls for months now. I have done everything that I can think of to do to get more information from CCA on what their policies were.”
The state then argued that Ray is “a very bright individual” and “it strains credibility” to believe that he could not understand AEDPA’s statute of limitations. Counsel continued, “So I do not think that it is beyond the realm of possibility that ... Mr. Ray learned of the one year time limit, learned that he had passed it and started with his collateral stuff and then at some point made these letters .... ” The state’s attorney further argued that “it seems incredible” that Ray would give Ms. Smith his section 974.06 motion right before he was going to be transferred to Wisconsin, and that “a Privileged Correspondence form would be given to an inmate in outgoing mail” and “a Certificate of Service ... would be, you *1001 know, full of spelling and grammatical errors.” Counsel repeatedly stated that Ray’s evidence “does not make a lot of sense,” especially “given Diamondback’s policy, where it clearly states that mail is not to be given to staff members.” Before concluding, the state’s attorney reiterated that Ray has “shown through many filings that he is clearly a bright and capable individual” and “I do not think that these supposedly arcane rules of habeas corpus are lost on him” because AEDPA “is not that complex” and “many prisoners, and certainly Mr. Ray” are capable of understanding the statute. Finally, counsel in closing stated:
We know only from Mr. Ray that the copies were missing or supposedly missing. We do not know what was copied. No one knows what was copied. The only statement about what was copied comes from Mr. Ray.
The fact that he transferred between five prisons in however many years and suddenly came upon this form that was some sort of smoking gun that he did not give to his attorney but instead gave to prison officials, I just find all of that incredible.
Hr’g Tr., 113-20, July 28, 2011.
On August 28, 2011, the district court issued an order dismissing Ray’s habeas petition as untimely. The court found that “Ray’s version of the events concerning the filing of his state motion for post-conviction relief is not credible.” The court’s decision closely paralleled the state’s closing argument. Its findings were based on the following: (1) Ray allegedly gave Ms. Smith his motion “when he knew he was on his way back to Wisconsin in a matter of days”; (2) Ray waited until October 4, 2006, to ask the clerk of the court” for information about his motion; (3) Ray failed to take any action other than sending Ms. Smith “nearly identical” letters; (4) the “somewhat curious” nature of Ray “retain[ing] a copy of a letter he sent only a month after he handed Smith his motion for postconviction relief, but [he] did not retain a copy of the motion itself’; (5) Ray’s certificate of service “bears no signatures, other than Ray’s, and appears on plain white paper with no heading or other indication that it is an official prison form ... [and] [e]ven when compared with the official property request form from Ray’s file, which also lacks an institutional heading and contains a grammatical error ... the certificate looks more like the work product of a prisoner than a prison administration”; and (6) Ray’s “knowledge of not only the one-year limitations period for federal habeas petitions, but also the mailbox rule and the rules governing tolling of the one-year period” which was demonstrated by his “two or three boxes of legal materials.” Finally, the district court pinpointed Ray’s claim that the signed receipt had been lost by the prison:
[I]t is clear that the document Ray handed CO Nedbal for photocopying could have been a document he created in an attempt to manufacture additional evidence to corroborate his claim that he handed his § 974.06 motion to Ms. Smith on April 27, 2004. The detail in which Ray described the document ... suggests a purpose beyond a simple request for a thirty-cent disbursement for photocopying.... [Nedbal’s] signature ... and acceptance of the document for copying, under the circumstances, cannot be reasonably viewed as proof of what the document was. Having worked in the library himself, Ray would have known as much.
The district court concluded that Ray was not credible, that he did not carry his burden of proving statutory tolling, and that his petition was time barred. Ray appeals.
*1002 II. ANALYSIS
This appeal raises two questions that we have yet to resolve in our circuit: first, whether the mailbox rule applies to toll AEDPA’s one-year limitations period when a prisoner delivers a Wisconsin section 974.06 postconviction motion to a prison official for mailing to the state court; second, if the mailbox rule applies, which party bears the burden of proof on the matter of timeliness when the state court never receives the prisoner’s motion. Our review of these unsettled legal issues is de novo. Simms v. Acevedo, 595 F.3d 774, 777 (7th Cir.2010). We will then decide if the district court clearly erred by finding that Ray did not give his section 974.06 motion to Ms. Smith on April 27, 2004 and that Ray’s federal habeas petition was untimely. See Bintz v. Bertrand, 403 F.3d 859, 865 (7th Cir.2005).
A. The Mailbox Rule Applies
In Houston v. Lack, the Supreme Court established the “bright-line rule” that a pro se prisoner files a federal notice of appeal, a prerequisite to federal appellate jurisdiction, at the moment the prisoner delivers it to a prison official for mailing to the court. 487 U.S. 266, 275-76, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). This rule is colloquially known as the “Houston ” or “prison” mailbox rule. Jones v. Bertrand, 171 F.3d 499, 500 (7th Cir.1999). The reasons for its existence are manifold.
For starters, pro se prisoners occupy a unique position in litigation. Unlike others, pro se prisoners cannot actively monitor their pending case, they cannot personally travel to the courthouse to ensure that their filings have been timely received, and they cannot freely track their mailings via consistent communication with the court, or the enlisted mail carrier, to determine if anything has gone awry. See Houston, 487 U.S. at 270-71, 108 S.Ct. 2379. Instead, a pro se prisoner must almost blindly rely on “vagaries of the mail” and the scruples of prison officials. Id. at 271, 108 S.Ct. 2379. “And if there is a delay the prisoner suspects is attributable to the prison authorities, he is unlikely to have any means of proving it, for his confinement prevents him from monitoring the process sufficiently to distinguish delay on the part of prison authorities from slow mail service or the court clerk’s failure to stamp the notice on the date received.” Id. In short, once a pro se prisoner’s filing leaves his hands he loses control over its processing. Id.
Additionally, prisons are (or should be) equipped with well-developed administrative procedures for “recording the date and time at which they receive papers for mailing.” Id. at 275, 108 S.Ct. 2379. In light of the inherent prison-prisoner power and information imbalance, prisons should be able to “readily dispute a prisoner’s assertions that he delivered the paper on a different date” by referencing “prison mail logs,” for example, or other reliable indicators of mailing established and controlled by the prison. Id. “The prison will be the only party with access to at least some of the evidence needed to resolve such questions — one of the vices the general rule is meant to avoid — and evidence on any of these issues will be hard to come by for the prisoner confined to his cell, who can usually only guess whether the prison authorities, the Postal Service, or the court clerk is to blame for any delay.” Id. at 276, 108 S.Ct. 2379.
Finally, the mailbox rule ensures that justice will be properly served. See Jones, 171 F.3d at 502. Although not always, our judicial system does recognize the complexity of our prescriptive procedural rules and we oftentimes relax those rigid requirements when a litigant appears in federal court unrepresented. E.g., Erickson *1003 v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam)(“A document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.” (citation and internal quotation marks omitted)); Castro v. United States, 540 U.S. 375, 381-82, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003)(explaining that federal courts may recharacterize a pro se litigant’s filing to avoid “unnecessary dismissal” and the “inappropriately stringent application” of labeling requirements, or to better correspond to the motion’s substance and legal basis). We have also taken significant steps to ensure that prisoners’ filings are not subject to the unrestrained whims of prison officials. See Fed.R.Civ.P. 4(c); see also United States v. Craig, 368 F.3d 738, 740 (7th Cir.2004) (“Today the mailbox rule depends on Rule 4(c) ..., [which] applies to ‘an inmate confined in an institution’ .... A court ought not pencil ‘unrepresented’ or any extra word into the text of Rule 4(c).”). The mailbox rule further counterbalances the heavy weight that our procedural rules have stacked against pro se prison litigants. In a just judicial system, a pro se prisoner’s chance of success should not be inextricably tied to his or her understanding and familiarity with the nuance of procedure; it should depend primarily on the substantive merits of the claim being asserted. The mailbox rule facilitates merits adjudication by, under certain circumstances, removing one — but not all — of the complex procedural hurdles standing in the pro se prisoner’s way. Because “[n]o matter how far in advance the pro se prisoner delivers his notice to the prison authorities, he can never be sure that it will ultimately get stamped ‘filed’ on time,” the mailbox rule renders this matter inconsequential in the interest of justice. See Houston, 487 U.S. at 271, 108 S.Ct. 2379.
With the rationale underlying the mailbox rule squarely in our sights, we must decide as a matter of first impression whether the rule applies to a Wisconsin pro se prisoner’s section 974.06 post-conviction motion.
AEDPA requires a federal habeas petition to be filed within one year from “the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.” 28 U.S.C. § 2244(d)(1)(A). “The one-year statute of limitations can be tolled, however, if the petitioner applies for ‘State post-conviction or other collateral review' of the judgment.” Price v. Pierce, 617 F.3d 947, 950 (7th Cir.2010)(quoting 28 U.S.C. § 2244(d)(2)). For statutory tolling to apply, the state post-conviction motion must be “properly filed.” 28 U.S.C. § 2244(d)(2). That determination is governed by state procedural law. Artuz v. Bennett, 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000).
• Ray filed his federal habeas petition on February 28, 2007. His state conviction became final on or about September 10, 2003, after the time expired for filing a petition for writ of certiorari in the Supreme Court for direct review of the state court’s judgment. See 28 U.S.C. § 2244(d)(1)(A); see also Anderson v. Litscher, 281 F.3d 672, 675 (7th Cir.2002) (“[W]e believe that the ninety day period during which a petition for certiorari may be filed by a state prisoner falls within the meaning of section 2244(d)(1)(A) for purposes of calculating when the statute of limitations begins to run.”). Given the three-year time difference between the state court’s final judgment and Ray’s federal filing, Ray’s federal habeas petition *1004 would be time barred absent tolling.[3]
The state, citing Wisconsin Statute sections 801.16(1) and 809.80(3), argues that Ray cannot benefit from the mailbox rule because Wisconsin requires “actual receipt” by the court clerk for a document to be “properly filed,” and Ray’s motion was not actually received before AEDPA’s limitations period expired. The state also argues that the mailbox rule should not apply where, as here, a prisoner’s post-conviction motion may be filed at any time. The state views section 974.06’s failure to include a filing deadline as proof that Wisconsin refuses to apply the mailbox rule in these circumstances. We do not find the state’s arguments persuasive.
A majority of our sister circuits have held that unless a state clearly rejects it, the Houston mailbox rule governs whether a state post-conviction document is “properly filed” under AEDPA. Compare Campbell v. Henry, 614 F.3d 1056, 1059 (9th Cir.2010)(California), and Stoot v. Cain, 570 F.3d 669, 671 (5th Cir.2009)(Louisiana), with Howland v. Quarterman, 507 F.3d 840, 844-45 (5th Cir.2007) (Texas), and Vroman v. Brigano, 346 F.3d 598, 603 (6th Cir.2003)(Ohio), and Adams v. LeMaster, 223 F.3d 1177, 1180 (10th Cir.2000)(New Mexico). But see Fernandez v. Artuz, 402 F.3d 111, 113-15 (2d Cir.2005) (“New York’s rejection of the mailbox rule does not preclude its application by a federal court in tolling a federal statute of limitations.” (emphasis original)); Anthony v. Cambra, 236 F.3d 568, 575 (9th Cir.2000)(“the mailbox rule applies with equal force to the filing of state as well as federal petitions”). Two recent but divergent Fifth Circuit cases illustrate this point. In Stoot, the Fifth Circuit held that even though the Louisiana Supreme Court had not considered the precise issue of whether the mailbox rule applies when a pro se prisoner’s pleading is mailed but not received, the state’s top court “has adopted the holding and reasoning of Houston,” so the rule extended to that case. 570 F.3d at 671. Stoot is distinguishable from the Fifth Circuit’s earlier decision in Howland because Texas, the relevant state there, unlike Louisiana, had clearly rejected the mailbox rule. 507 F.3d at 844-45. The thread weaving these disparate outcomes together is the manner in which the underlying state’s procedural law treats pro se prisoners’ post-conviction filings. See Artuz, 531 U.S. at 8, 121 S.Ct. 361. We agree with the majority of our sister circuits and hold that the mailbox rule applies to a state pro se prisoner’s post-conviction filings unless the state where the prisoner was convicted has clearly rejected the rule.
Wisconsin procedural law is at issue here, and we think it is clear that Wisconsin has fully embraced the Houston mailbox rule. First, Wisconsin does not require “actual receipt” for a post-conviction motion to be deemed properly filed. The state’s principal citation, Wis. Stat. § 801.16(1), simply states that court filings “shall be made by filing them with the *1005 clerk of circuit court.” And Wisconsin Statute section 809.80(3), which says that the court clerk must “receive” a filing before the applicable deadline for it to be “timely,” does not apply to pro se prisoners. See Wis. Stat. § 809.80(3)(e). Instead, a pro se prisoner’s petition is filed “on the date that the confined person delivers a correctly addressed petition to the proper institution authorities for mailing,” provided that the prisoner files a “certification or affidavit setting forth the date on which the petition was delivered to the proper institution authorities for mailing.” Id.
Second, the Supreme Court of Wisconsin made its endorsement of the. Houston mailbox rule abundantly clear in State ex rel. Nichols v. Litscher, 247 Wis.2d 1013, 635 N.W.2d 292, 295-96 (2001). In that case, the court, persuaded by Houston’s rationale, applied the mailbox rule to a pro se prisoner’s state certiorari action. Id. at 298 (‘We are persuaded by the rationale in Houston’’). It doing so, the court explained that it was not “mandat[ing] any particular procedure that [pro se prisoner] litigants must follow,” but “a certificate of service or affidavit of mailing ... would create a rebuttable presumption that the prisoner had delivered his or her petition to the proper prison authorities ■ on the particular day certified.” Id. at 299.
The state dismisses Nichols because it addressed tolling the time for petitioning the state supreme court for review after an appellate court’s affirmance. The state correctly notes that section 974.06 motions are not subject to any time requirements, but this does not matter. All of the concerns animating the Supreme Court’s decision in Houston and the Supreme Court of Wisconsin’s decision in Nichols apply with equal force to pro se prisoner filings not subject to a time requirement. A pro se prisoner’s unique litigation disadvantages do not disappear when filing deadlines are eliminated. Ray’s situation provides a perfect case in point — although he fully complied with section 974.06, the state has attacked his federal habeas petition as untimely. Notwithstanding Wisconsin’s generous acceptance of section 974.06 post-conviction motions at any time, there are practical (and in this case drastic) consequences for not filing the motion within one' year of the final judgment.
Suppose it was undisputed that Ray gave his postconviction motion to a prison official within AEDPA’s one-year time frame but the state court received the document one year and one day later due to some honest oversight in the prison mail system. Accepting the state’s position would leave Ray without a federal forum to collaterally attack his conviction, unless he could prove his entitlement to equitable tolling. Statutory tolling would offer no reprieve because without the benefit of the mailbox rule, Ray’s state motion was not “properly filed” within AEDPA’s one-year period. The state is comfortable with this result bpcause section 974.06 itself imposes no filing deadline. But we are not. In our hypothetical, Ray’s inability to control and monitor his mailings would be the reason for his habeas misfortune. The Supreme Court established the Houston mailbox rule to obviate such objectionable outcomes.
The gravamen of the state’s argument is that the mailbox rule does not apply where a prisoner’s filing is not subject to a timeliness requirement. The state reasons as follows: the mailbox rule applies if there is a filing deadline; Ray could file his state post-conviction at any time, so the mailbox rule does not apply to Ray’s filing. We reject this reasoning. Just because a pro se prisoner can benefit from the mailbox rule to statutorily toll AEDPA’s one-year period if a state filing is subject to a deadline, it does not follow that the rule *1006 cannot apply where the state imposes no such deadlines. A time limit is only one “condition to filing” that a pro se prisoner must abide to statutorily toll AEDPA with a “properly filed” state post-conviction pleading. See Allen v. Siebert, 552 U.S. 3, 6, 128 S.Ct. 2, 169 L.Ed.2d 329 (2007) (“Whether a time limit is jurisdictional, an affirmative defense, or something in between, it is a ‘condition to filing’ — it places a limit on how long a prisoner can wait before filing a postconviction petition.” (citation omitted)). And the question of whether a petition is “properly filed” remains a matter of interpreting a federal statute. See Holland, 130 S.Ct. at 2563. We defer to a state court’s interpretation of its own procedural rules out of respect for the principles of federalism. But the absence of state-imposed conditions to filing under state law does not prevent us from recognizing a document as “properly filed” under AEDPA as a matter of federal law. See, e.g., Sulik v. Taney Cnty., 316 F.3d 813, 815 (8th Cir.2003)(holding that Houston “applies regardless of the length of the limitation period”); Lewis v. Richmond City Police Dep’t, 947 F.2d 733, 736 (4th Cir.1991)(holding that the Houston mailbox rule “provides that a statute of limitations has the same practical effect on every pro se prisoner litigant it governs” and “[t]he length of the time restriction involved is irrelevant”).
Many courts, including the Supreme Court, have consistently conveyed concerns about the pro se prisoner’s unique litigation disadvantage, including his inability to control and monitor documents that he sends to the court. E.g., Houston, 487 U.S. at 270-71, 108 S.Ct. 2379; Jones, 171 F.3d at 500-01. As one means of addressing these concerns, we will apply the mailbox rule to a prisoner’s state post-conviction filings unless the state has clearly rejected the rule. Because the Wisconsin Supreme Court held in Nichols that the mailbox rute aperabifcto. “file” a pro se prisoner’s court femment when the prisoner delivers it to a prison'.official for mailing, that pronouncement¥%overns. Nichols, 635 N.W.2d at 298. Ra^,* therefore, ean rely on the Houston mailbox rule to statutorily toll AEDPA’s limitations period, even though Wisconsin permits section 974.06 post-conviction motions t0 be filed at any time.
B. The State Bears the Burden « Proving Untimeliness
Having decided that the Houston mailbox rule applies, we turn to the burden of proof. It is well-settled that AEDPA’s statute of limitations is a non-jurisdictional affirmative defense. Day v. McDonough, 547 U.S. 198, 205, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006). Generally, the party raising an affirmative defense bears the burden of proof. See Gildon v. Bowen, 384 F.3d 883, 886 (7th Cir.2004). The same is true in the habeas context. See id. (“Since the period of limitations is an affirmative defense, the state has the burden of showing that the petition is untimely.”). Ray argues that this axiom should end our inquiry, and that the state should bear the burden of proving that his federal habeas petition is untimely. But resolution of this issue is not so straightforward.
The state identifies two potential problems with applying the general rule to this case. First, tolling offers one way around the statute of limitations and it makes intuitive sense to require the party requesting tolling to prove its appropriateness. The state finds support for this argument in how courts allocate the burden of proof in cases involving equitable tolling. E.g., Pace, 544 U.S. at 418, 125 S.Ct. 1807. Second, in cases like this one, where a petitioner’s purported filing is never received, the state would be re *1007 quired to prove a negative: that the petitioner did not give a prison official his petition before AEDPA’s one-year limitations period ran. We believe both concerns are overstated.
It is certainly true that the petitioner bears the burden of proving “equitable tolling.” Id. But equitable tolling, as its name suggests, is an appeal to equity. See Holland, 130 S.Ct. at 2563. It is not a matter of statutory interpretation. As is almost always the case, the party seeking equity must prove its entitlement to equity. See, e.g., Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 233, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (Ginsburg, J., dissenting) (“As courts in the common-law realm have reaffirmed: ‘Principles of equity, we were all taught, were introduced by Lord Chancellors and their deputies ... in order to provide relief from the inflexibility of common law rules.’ ” (citation omitted)); Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 244-45, 54 S.Ct. 146, 78 L.Ed. 293 (1933)(“The governing principle is ‘that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine....’” (citation omitted)); see also Robertson v. Simpson, 624 F.3d 781, 784 (6th Cir.2010)(“The party seeking equitable tolling bears the burden of proving he is entitled to it.”). Statutory tolling, however, is quite different. Equity is not involved, and blameworthiness is not relevant. See Holland, 130 S.Ct. at 2561-62 (describing § 2244(d)(2) tolling as of “a different kind” than equitable tolling). Regardless of how diligent or dilatory a federal habeas petitioner might be, AED-PA’s “one-year clock is stopped ... during the time the petitioner’s ‘properly filed’ application for state postconviction relief ‘is pending.’ ” Day, 547 U.S. at 201, 126 S.Ct. 1675 (quoting 28 U.S.C. § 2244(d)(2)). Equitable tolling can be invoked only after a finding or concession that the one-year period has expired. See Cross v. Sisto, 676 F.3d 1172, 1175-76 & n. 2 (9th Cir.2012). So placing the burden on the party requesting equitable tolling is functionally equivalent to first finding that the federal petition is untimely and then requiring the petitioner to prove that “equity” should except or excuse such untimeliness. In this way, the burden is rightfully on the petitioner, as the party seeking application of an equitable exception to the timeliness rule. Cf. Knox v. Cook County Sheriff's Police Dep’t, 866 F.2d 905, 907 (7th Cir.1988) (“While the statute of limitations is an affirmative defense, the burden of establishing an exception thereto is on plaintiff.”).
Our section 2244(d)(2) statutory tolling inquiry is one step removed from equitable tolling. It tells us which days count toward the one-year limitations period. As the statute itself puts it, the “time” that a properly filed petition “is pending shall not be counted” toward AEDPA’s limitations period. 28 U.S.C. § 2244(d)(2). We think the state should have to prove that each of the 365 days it relies on for its affirmative defense actually qualifies as a “countable” day under the statute. See Fleming v. Evans, 481 F.3d 1249, 1257 (10th Cir.2007) (“The state bears the burden of proving that the AEDPA limitations period has expired.”); Griffin v. Rogers, 308 F.3d 647, 653 (6th Cir.2002) (“[T]he party asserting statute of limitations as an affirmative defense has the burden of demonstrating that the statute has run.”). We are particularly persuaded by the fact that a petitioner “cannot bring a federal habeas claim without first exhausting state remedies — a process that frequently takes long *1008 er than one year,” so Congress, in enacting section 2244(d)(2)’s statutory tolling provision, explained “how the limitations statute accounts for the time during which such state proceedings are pending.” Holland, 130 S.Ct. at 2562. And “[t]o provide accurate information about prior state court proceedings, most habeas petitioners are forced to rely on state court records ..., [and it] is not the petitioner, but rather the state that is in the best position to provide this information.” Kilgore v. Attorney Gen. of Colo., 519 F.3d 1084, 1088 (10th Cir.2008); see also R. Governing § 2254 Cases 5(d)(requiring a state to file, along with its answer, copies of “the opinions and dispositive orders of the appellate court relating to the conviction or the sentence”).
Traditionally, courts have placed the burden of proof on the party in the best position to prove its case. See, e.g., Alaska Dep’t of Envtl. Conservation v. EPA 540 U.S. 461, 494 n. 17, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) (“Among other considerations, allocations of burdens of production and persuasion may depend on which party — plaintiff or defendant, petitioner or respondent — has made the ‘affirmative allegation’ or ‘presumably has peculiar means of knowledge.’ ” (citation omitted)). This principle of practicality has roots in common law. See United States v. Cont’l Ins. Co., 776 F.2d 962, 964 (11th Cir.1985) (“[we adhere] to the common law guide that the party in the best position to present the requisite evidence should bear the burden of proof’). And it just “makes sense to place at least some of the burden on the parties with the best access to the information.” . Saleem v. Keisler, 520 F.Supp.2d 1048, 1059 (W.D.Wis.2007). So “all else being equal, the burden [of proof] is better placed on the party with easier access to relevant information.” Nat’l Commc’n Ass’n Inc. v. AT & T Corp., 238 F.3d 124, 130 (2d Cir.2001). In the habeas context, the state is in the best position to prove that the limitations period has run. It will “usually be able to meet this burden by pointing to materials already before the district court, namely, by pointing [to] the petition itself,” or by presenting evidence that it can easily access from the prison. See Griffin, 308 F.3d at 653.
When questions about AEDPA’s statutory tolling arise, many of our sister circuits have employed a “burden shifting” framework requiring the petitioner to make a threshold evidentiary showing before shifting the burden of proof to the state. E.g., Allen v. Culliver, 471 F.3d 1196, 1198 (11th Cir.2006) (per euriam)(requiring petitioner to make a prima facie showing of delivery before shifting the burden to the state); Caldwell v. Amend, 30 F.3d 1199, 1203 (9th Cir.1994) (same); see also Grady v. United States, 269 F.3d 913, 916 (8th Cir. 2001) (“[u]nder our jurisprudence, then, a prisoner seeking to benefit from the prison mailbox rule must satisfy the requirements of Rule 4(c)”). Today, we follow their lead. If the state raises an AEDPA statute of limitations defense, the petitioner must come forward with some evidence to support his claim that, with the benefit of the Houston mailbox rule, 365 countable days have not elapsed from the time his state-court judgment became final to the time he filed his federal habeas petition. See Allen, 471 F.3d at 1198. After the petitioner makes this evidentiary showing, the burden shifts to the government to prove that the limitations period has run. See id.
The state argues that the burden shifting framework is inappropriate in cases like this one, where the court never receives the prisoner’s purported filing. The Fifth, Ninth, and Eleventh Circuits have each confronted this issue. See Huizar v. Carey, 273 F.3d 1220, 1222 (9th Cir.2001); Allen, 471 F.3d at 1198; Stoot, 570 F.3d at 671. Not one has abandoned the burden shifting framework under similar circum *1009 stances. To the contrary, they each have applied the usual framework, limiting the petitioner’s burden to that of making a threshold evidentiary showing of timely delivery to a prison official regardless of whether the purported filing was received by the court. Allen, 471 F.3d at 1198. After the petitioner makes this showing, ordinarily via a sworn declaration or notarized statement, the burden shifts to the state to prove untimeliness. E.g., Huizar, 273 F.3d at 1223-24; Allen, 471 F.3d at 1198.
In Huizar, the petitioner gave prison officials his state habeas petition for mailing. He wrote to the state court to get an update about two months later, but received no response. Twenty-one months later, he wrote again. In his second letter, he detailed his previous attempt to file his petition and requested that the court investigate the matter. One month later, the petitioner received the court’s response informing him that his petition had never been received. The petitioner then filed a supplemental petition, which the court denied. The case required the Ninth Circuit to decide for the first time whether the mailbox rule “applies if the petition is never received or filed by the court.” Huizar, 273 F.3d at 1222. The petitioner argued that the “period from the date he gave his first state petition to prison officials ... to the date it was denied ... does not count toward AEDPA’s one-year period.” Id. at 1223 (emphasis added). Agreeing that Houston’s “rationale applies with equal force” in cases where the court does not receive the purported filing, the Ninth Circuit held that “[a] prisoner who delivers a document to prison authorities gets the benefit of the prison mailbox rule, so long as he diligently follows up once he has failed to receive a disposition from the court after a reasonable period of time.” Id. at 1224. The court found as a matter of law that twenty-one months is “not an unusually long time to wait for a court’s decision,” but remanded the case to the district court to give the “state ... the chance to contest” whether the petitioner “handed over his petition” when he claimed to have done so. Id.
In Allen, the Eleventh Circuit applied the mailbox rule despite the fact that the petitioner’s federal notice of appeal was not received by the court. 471 F.3d at 1198. The court disagreed with the Ninth Circuit’s imposition of a diligence requirement because “[o]nce there has been a finding of fact that a timely notice of appeal was in fact delivered to the proper prison authorities ..., there is no room ... for the operation of a diligence requirement.” Id. It remanded the case, however, so the district court could “inquire further as to the actual facts concerning whether ... a notice of appeal was delivered to the prison authorities.” Id. In so doing, the Eleventh Circuit explained that “both Houston and Fed. R.App. P. 4(c)” suggest that “the burden of proof should be placed upon the state if Allen files a sworn declaration or notarized statement setting forth the date of deposit and attesting that postage had been paid.” Id. at 1198-99 & n. 2.
Notwithstanding the Ninth and Eleventh Circuits’ split on the “diligence” requirement, both recognize that Houston’s rationale supports placing the burden on the state to prove untimeliness. The Ninth Circuit appealed to the practical disadvantages and fundamental unfairness of putting the burden on the prisoner because “ ‘prison officials may have an incentive to delay prisoners’ court filings, and prisoners will have a hard time proving that the officials did so.’ ” Huizar, 273 F.3d at 1223 (quoting Houston, 487 U.S. at 270-71, 108 S.Ct. 2379). The Eleventh Circuit found those same factors persuasive. Allen, 471 F.3d at 1198 n. 2 (citing *1010 Houston for the proposition that prisons have procedures in place and can readily dispute a prisoner’s assertions of delivery). We agree that the ultimate burden of proof in these cases should rest with the state because the pro se prisoner occupies a unique disadvantage, and he cannot control or freely monitor documents that he directs to the court. See Houston, 487 U.S. at 275-76, 108 S.Ct. 2379. The burden shifting framework we adopt today reflects the state’s “superior access to the proof.” Int’l Brotherhood of Teamsters v. United States, 431 U.S. 324, 359 n. 45, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (“Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party’s superior access to the proof.”). It is also consistent with Congress’s overarching goals for AEDPA, which includes maintaining federal-state comity, securing the finality of the judicial process, and expeditiously handling habeas proceedings. As the Supreme Court recently made clear, AEDPA’s goals are often well served by empowering district court judges with discretion to reach the substantive merits of a habeas petition. Cf. Day, 547 U.S. at 208, 126 S.Ct. 1675 (holding that “considerations of comity, finality, and the expeditious handling of habeas proceedings” are better served by permitting judges to exercise discretion in each case to decide whether to sua sponte dismiss on statute of limitations grounds or reach the merits of the petition).
We pause to address the state’s argument that our allocation of the burden in this way would require it to prove a negative. This argument has only superficial appeal. “Proving a negative” suggests requiring the state to do the impossible— that is, to exclude the petitioner’s delivery of his filing to a prison official from the realm of all possibility. But the state is not required to prove to a statistical certainty that the petitioner did not hand his document to a prison official on the date that he claims to have done so, and parties are required to make similar showings all the time in litigation. Indeed, the very merits of a statute of limitations defense depends on a showing that the complainant did “not” file a lawsuit in time. See, e.g., Kilgore, 519 F.3d at 1088-89 (“[A] heightened pleading requirement would be inconsistent with other aspects of the habeas scheme, which recognize the practical difficulties petitioners face in bringing their claims.”). There can be no doubt that the state is in a better position to show that a prisoner did not give his petition to a prison official for mailing than the prisoner is in to prove that he did. See Pliler v. Ford, 542 U.S. 225, 232, 124 S.Ct. 2441, 159 L.Ed.2d 338 (2004) (“[Timeliness] calculations depend upon information contained in documents that do not necessarily accompany the petitions.”). As the Houston Court emphasized, the pro se prisoner hands his petition “over to prison authorities who have well-developed procedures for recording the date and time at which they receive papers for mailing and who can readily dispute a prisoner’s assertions that he delivered the paper on a different date.” Houston, 487 U.S. at 275-76, 108 S.Ct. 2379. The state “will be the only party with access to at least some of the evidence needed to resolve such questions.” Id. It could, for example, produce “prison mail logs” or present the (likely non-adverse) testimony of the prison official who allegedly handled the prisoner’s mail. As for the pro se prisoner confined to his cell, “evidence on any of these issues will be hard to come by” and he can “only guess whether the prison authorities, the Postal Service, or the court clerk is to blame for any delay.” Id. This is “one of the vices the [mailbox] rule is meant to avoid.” Id.
*1011 We should not forget that it is the state, vis-a-vis the prison, that determines how prison mail is handled in the first place. The state could require its prisons to implement detailed intake and outgoing procedures for prisoner mail, including signatures on receipt, copies of envelopes addressed to the court, or other mechanisms aimed at closely tracking prisoner mail. We see no reason why a prison’s failure to institute such procedures should serve to penalize pro se prison litigants. Instead, it reinforces our belief that “the prison [should bear] the burden of showing that the prisoner should not be entitled to the benefits of Houston’s dispensation.” See Thomas v. Gish, 64 F.3d 323, 325 (7th Cir.1995). This is so because the prison could, if it wanted, adopt these or similar procedures. Its failure to do so leaves the pro se prisoner bearing the risk that his document will be mishandled, but without the means of proving his case. Since it has control over the prison mail policies, control over prisoner mail, and control over the prisoner himself, the state should bear the burden of proving that a pro se prisoner’s federal habeas petition is untimely. See Washington v. United States, 243 F.3d 1299, 1301 (11th Cir.2001) (per curiam)(“[A] prisoner’s pro se § 2255 motion is deemed filed the date it is delivered to prison authorities for mailing” and “the burden is on prison authorities to prove the date a prisoner delivered his documents to be mailed. Absent evidence to the contrary in the form of prison logs or other records, we will assume [the petitioner’s claim is true].”). To the extent the state feels it is tasked with “proving a negative,” it can allay those concerns by implementing procedures to better track and document its prisoners’outgoing mail. See.id.
The partial dissent (hereinafter the “dissent”) suggests that placing the burden on the state is particularly troublesome in this case because the prison policy forbade staff from handling mail for an inmate. (See post at 1020.) But this interpretation of prison policy is simply incorrect. The policy relied upon by the dissent, “All inmate mail will be processed through the institutional mailroom. No person, either staff or visitors, is permitted to bring in or take out any mail or article for an inmate,” is more naturally read to mean that mail coming in or out of the prison cannot be delivered through anything other than the institutional mailroom (i.e., inmates cannot directly give mail to visitors for placement into a mailbox outside of prison). Furthermore, another provision in the same section of the prison policy expressly provides, “At no time will an inmate/resident be involved in the collection, handling, or distribution of mail,” which necessarily means that staff are responsible for collecting or handling inmate mail, likely for security reasons. In any event, the state proffered no evidence to contradict Ray’s testimony that he was allowed to give outgoing mail to staff for delivery to the mailroom, which is entirely consistent with the above interpretation.
We recognize the need to identify some limiting principle. Otherwise, as the state correctly points out, a prisoner’s purported filing might be “properly filed” or “pending” for years without anyone knowing. To avoid this, we think the petitioner’s requisite evidentiary showing should be exacting. The prisoner’s sworn declaration should identify the who, what, when, where, how, and why of his alleged delivery to a prison official. And in cases where the purported filing is not received by the court, the petitioner must supply a sworn declaration attesting to these facts plus some other corroborating evidence. This “other evidence” can be documentary (for example, copies of the filing, post *1012 marked envelope, or other correspondences). Or, it may be testimonial. But once the pro se prison litigant adduces such evidence, he has done all that is required. The burden then shifts to the state to show untimeliness.
We also reject the Ninth Circuit’s “diligence” requirement. We agree with the Eleventh Circuit that a prisoner’s lack of diligence cannot operate to unfile a filed document. See Allen, 471 F.3d at 1198. And requiring prisoner diligence is inconsistent with the spirit of the Houston mailbox rule. The whole point is that the prisoner is not at liberty to freely monitor his correspondences from mailing to delivery. How might a prisoner follow up with the court? With additional mailings? If prison officials are dead set on preventing a prisoner from filing court documents, they probably will interfere with the prisoner’s ability to diligently follow up on previously sent but not received filings, and if they are completely incompetent the petitioner’s follow-up mail will also likely not be delivered. Under either circumstance, the diligence requirement would nullify the rule. We do not accept results so inconsistent with Houston.
“[T]he potential for fraud does not justify obligating truthful prisoners to prove that they mailed their [court documents] when the prison authorities do not provide them with means for verification.” Dole v. Chandler, 438 F.3d 804, 813 (7th Cir.2006)(exhaustion of state grievance procedures in prisoner § 1983 case). Accordingly, we hold that in cases where the pro se prisoner’s post-conviction motion is not received, the petitioner must submit a sworn statement and some evidence to support his claim that he timely delivered the filing to a prison official, but once he satisfies this evidentiary showing, the burden shifts to the state to prove that his federal habeas petition is untimely.
C. The State Did Not Carry Its Burden
To summarize what we have accomplished so far, the Houston mailbox rule operates to “file” a pro se prisoner’s state post-conviction motion under AEDPA’s statutory tolling provision unless the state has clearly rejected the rule. This rule applies even if the filing is not subject to a deadline under state procedural rules and regardless of whether the petitioner’s purported filing is actually received by the court. But if the filing is not received, the petitioner bears the initial burden of identifying (by a sworn declaration in compliance with Fed. R.App. P. 4(c)) the who, what, when, where, how, and why of his timely delivery to a prison official and providing some additional corroborative evidence. Once the petitioner makes this evidentiary showing, however, the burden shifts to the state to prove that the federal habeas petition is untimely. With these legal issues settled, we now address the merits of Ray’s appeal.
The district court found that Ray was “not credible” and that he did not give Ms. Smith his section 974.06 motion on April 27, 2004. It made this determination despite Ray’s sworn declaration, live testimony, myriad supporting documents, and the corroborating testimony of two prison employees. The court, adopting the state’s argument, dismissed Ray’s testimony and evidence as products of an elaborate fraud designed by a “sophisticated” individual to circumvent AEDPA’s one-year limitations period.
We review the district court’s findings of fact for clear error. Bintz, 403 F.3d at 865. “A factual finding is clearly erroneous when, after reviewing the complete record, we are left with the definite and firm conviction that a mistake has been committed.” Holleman v. Cotton, *1013 301 F.3d 737, 741-42 (7th Cir.2002) (citation and internal quotation marks omitted). We will reverse if the district court’s findings are “implausible in light of the record viewed in its entirety.” Gorham v. Franzen, 760 F.2d 786, 790 (7th Cir.1985) (citation and internal quotation marks omitted). But if there “are two permissible views of the evidence, the [district court’s] choice between them” will not be disturbed. Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The dissent notes that “ ‘[special deference is given to the district court’s factual determinations because the district court had the opportunity to hear the testimony and observe the demeanor of witnesses____’ ” (Post at 1021 (quoting United States v. Smith, 668 F.3d 427, 430 (7th Cir.2012)); see also id. at 1037 (“the district court had the benefit of watching Ray’s demeanor ... ”).) We agree. But here the district court made no finding concerning Ray’s demeanor or presentation, and instead based its “credibility” finding on nothing more than a string of speculative doubts, none of which were based on any competent contradictory evidence presented by the state, as we explain below.
We begin by reviewing Ray’s evidence. Before the evidentiary hearing, Ray submitted a sworn declaration describing the who, what, where, where, why, and how of the events that made his filing timely under Houston. Ray swore, under penalty of perjury, that he gave his state post-conviction motion to Ms. Tamara Smith, an undisputed prison official, during “lunchtime” on April 27, 2004. He alleged that he gave Ms. Smith his motion “downstairs” in his prison unit and the two proceeded into the “social worker’s office” where she searched for, located, and provided him two documentary receipts. He also explained “why” he gave Ms. Smith his motion instead of using the prison mail system: his unit was on administrative confinement and the prisoners had no access to the regular mail system at the time. The dissent asserts, “It is difficult to believe that a prisoner could roam with that much freedom and be able to walk to the social worker’s office, but be unable to walk with the social worker to the centrally located mailbox or the prison mail-room.” (Post at 1026.) But this doubt is based purely on speculation about how Diamondback was configured, and what its specific administrative confinement policies were. Absent actual evidence, it is not implausible to believe that prisoners are entitled to access their social workers during periods of administrative confinement but not the mailroom.
The documents Ray provided corroborated his testimony. He kept and produced copies of the letters he allegedly sent Ms. Smith on June 1, 2004, September 9, 2004, June 15, 2005, and November 1, 2006. He offered a copy of the certificate of service that she allegedly pulled from a cabinet in the social worker’s office and gave him to sign after he gave her his post-conviction motion. The dissent emphasizes the discrepancy between Ray’s testimony that he filled out the certificate of service form, and other documents in which Ray refers to the certificate of service form as being filled out or signed by Ms. Smith. (See post at 1025.) But this minor discrepancy does not render Ray’s story “so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.” Anderson, 470 U.S. at 575, 105 S.Ct. 1504. The dissent argues that, “[h]ad [Ray] not changed his story, the State could have shown, through handwriting analysis, that Ray had completed the form.” (Post at 1025.) But it makes no difference who technically filled out that form, so long as it demonstrates *1014 that Ray had asked Ms. Smith to mail out his motion.
The typos in the document, and its lack of any distinguishing characteristics like a letterhead, were consistent with other official CCA documents, of unquestioned authenticity, that Ray introduced into evidence bearing the same defects. And no one testified that Ray’s certificate of service was phony. In comparing these forms, the district court “remain[ed] convinced that in both form and content the certificate looks more like the work product of a prisoner than a prison administrator,” and the dissent argues that we have improperly substituted our judgment for the district court’s. (See post at 1024.) Such substitution might be improper if the district court had a sound basis for arriving at this conclusion, such as actual testimony about the falsity of the form or the high grammatical standards to which prison forms adhere. But the district court’s only basis was its own eyeball comparison of the documents, and upon review of the documents on appeal, we conclude that they are not so inherently dissimilar that a factfinder could reasonably conclude that one is a fake, while the other is not.
Although the CCA receipt that Ms. Smith reportedly signed was not in the record, Ray offered an essentially uncontested reason for his failure to produce it: the prison library or mail system lost the document after he gave it to the library staff for copying. The only evidence remotely contradictory was the testimony that this might have been the first time during both Officer Nedbal’s and Ms. Martin’s tenure that a prisoner’s copy request had been lost. But as both Officer Nedbal and Ms. Martin confirmed, the prison would only know if the prisoner reported it to the library staff or some other prison official. So it is certainly possible that Ray’s requested copies were not the first to be lost. Even if they were, that fact does not establish an evidentiary basis for finding that Ray manufactured the CCA receipt or fabricated a fictitious tale about it. The state could have, but did not, put Ms. Smith on the stand to dispute Ray’s claims.
Finally, in addition to offering his own sworn testimony and corroborative documents, Ray presented the testimony of two prison employees, Officer Nedbal and Ms. Martin. While both admitted that they could not be certain that the documents that Ray claims to have been lost were actually lost or contained the original receipt that Ms. Smith allegedly signed, they also testified that prison policy required prisoners to describe in detail the documents they submit for copying and anything “suspicious” would be reviewed by a supervisor. Included on the list of “suspicious” requests were submissions with descriptions that did not match its contents. But no one flagged Ray’s submission for review. The testimony of both Officer Nedbal and Ms. Martin lent further credibility to Ray’s claim that he had, but lost, a CCA receipt signed by Ms. Smith.
The dissent defends at length the district court’s speculative basis for finding that the privilege correspondence receipt was entirely fabricated. (See post at 1026-33.) The following points of response are in order. First, it takes a speculative leap to go from the mere fact that Ray described the document in the disbursement request form in a lot of detail to the conclusion that he fabricated it. Second, the fact that librarians were not required to affirmatively verify the authenticity of documents to be copied does not create a reasonable inference that the document was therefore a fake or nonexistent. Third, the dissent joins the district court in critiquing Ray’s shortcomings as a pro se litigant, such as Ray’s less-than-perfect *1015 bookkeeping practices or failure to cite the most convincing pieces of evidence (e.g., the receipt) at specific stages of proceedings (see also id. at 1035-36 (noting failure to have state motion notarized, failure to notify state court of prison transfers, and failure to retain copies of certain documents)), but that is simply insufficient to jump to the conclusion that the receipt must therefore not exist. Fourth, the dissent finds it incredible that upon obtaining representation, Ray would take it upon himself to track down the receipt, but as any pro bono attorney representing an overly eager prisoner client can attest, that is not so inherently unusual, especially when attorney-client communication is neither quick nor easy when the client is in prison and can be transferred at any time with little notice if any to the attorney, further delaying communication. Last, the dissent argues that it is implausible that Ray would have been able to obtain the receipt which was held by another inmate in another prison in less than 18 days. (See also id. at 1036-37.) That theory is not without force, but unfortunately for the state, it did not actually produce any evidence to support it.
Ray’s sworn declaration, live testimony, documentary evidence, and corroborating witnesses were more than sufficient to shift the burden of proving untimeliness to the state. The state’s evidence consisted of two things: Ms. Highley’s testimony and the Diamondback Correction Facility’s prisoner mail policy. Ms. Highley had no record of Ray purchasing postage during April 2004. But her knowledge was limited to that specific time frame. She could not rule out the possibility that Ray had retained postage from earlier purchases, borrowed stamps from other prisoners, or received postage from family members or friends who were not incarcerated.[4] The prisoner mail policy added nothing of substance. Although Ray claims to have received a receipt for his outgoing legal mail and the policy does not mention issuance of receipts for such mail, the state did not produce Ms. Smith or some other prison official to counter Ray’s testimony that the prison had, and occasionally provided, receipts.
The state did advance a number of arguments at the evidentiary hearing. First, it labeled Ray a “sophisticated” prisoner, with habeas expertise, because he had “boxes” of legal documents. Were these small shoe boxes or large moving boxes? Were they filled with distinct documents or multiple drafts or copies of only a handful unique ones? The record does not say. And unlike the dissent, we do not find it at all inconsistent that Ray did not understand the law governing federal habeas corpus when he wrote the state court on October 4, 2006, but then filed a petition in federal court purportedly demonstrating sophisticated knowledge about habeas on November 27, 2006. (See post at 1033-34.) It is not implausible that Ray would obtain a working knowledge of habeas in two months, especially after the need for such knowledge took on increased urgency when he learned that his state motion was never filed. It is also not at all unusual for pro se filings to contain sophisticated legal arguments, since prisoners routinely rely *1016 on templates created by other inmates when filing motions; indeed, Ray testified that he was “relying off inmates to help.”
Second, the state accused Ray of concocting a sophisticated scheme in October 2006 to assert a mailbox rule claim and avert AEDPA’s one-year time bar. According to the state, Ray made up the whole story about giving his section 974.06 motion to Ms. Smith and receiving two receipts (one signed) from her. He manufactured the certificate of service and the letters that he swears he sent Ms. Smith in order to support his bogus claim. Ray then pursued his mailbox rule strategy in federal court after the state appellate court denied his post-conviction motion. Finally, after we found that his constitutional rights had been violated during his criminal trial and remanded to the district court to give the state an opportunity to rebut Ray’s claim of timeliness, Ray tricked the prison staff into believing that they had copied and lost a CCA receipt signed by Ms. Smith.
What the state did not do, however, was present evidence in support of its theory. It did not produce Tamara Smith, nor deny her existence. It is certainly possible that, had she been called, Ms. Smith might have testified that she has no recollection of April 27, 2004. But it is equally likely that she might have flatly denied Ray’s account, or — worse for the state— confirmed it. Unfortunately, we can only speculate because the state did not produce her. Nor did the state produce any of Diamondback’s former employees to explain if and how the mail policy applied when prisoners were administratively confined, whether receipts were provided for outgoing legal mail, whether prisoners at the facility would have known that they were slated to be transferred to a different prison and the scheduled date of transfer, or whether Ray’s supporting documents were fraudulent. And the Diamondback prison mail logs? Not in the record. None of this evidence is in the record. The dissent agrees that the state did not present the above evidence, but notes that the “law does not require direct evidence to prove a fact — circumstantial evidence will suffice.” (Post at 1022; see also id. at 1022 n. 2 (state’s “inability to obtain direct evidence of Ray’s fraud does not insulate Ray from a finding that he is not credible”).) But the state did not even present circumstantial evidence upon which a fact-finder could have reasonably based his doubts about Ray’s testimony.
The dissent argues that, based on Ray’s testimony that he was in administrative confinement because “they was bringing Wisconsin prisoners back from Oklahoma back to Wisconsin,” the district court “could very reasonably conclude that Ray knew he was returning to Wisconsin while in confinement and that it was strange that he would decide to mail the motion to a Wisconsin court from Oklahoma....” (Post at 1024.) But even if Ray did know that he was returning to Wisconsin (and nothing shows he knew when he would be transferred), the fact that a prisoner would want to mail an important state post-conviction motion as soon as it was ready is not so incredible such that the district court could have reasonably discredited his testimony. It is not clear how placing mail destined for a Wisconsin address in a Wisconsin mailbox is so superior to placing it in an Oklahoma mailbox, such that any normal prisoner would obviously delay filing such a critical motion (and consequently, delay his potential release from prison) for an indefinite period of time, just for the opportunity to put that motion in a Wisconsin mailbox.
In sum, the state prevailed in the district court by branding Ray a sophisticated *1017 prison litigant and a liar, without any evidence to support those accusations.
We think Ray’s counsel hit the nail on the head in his briefs and at oral argument. The state’s argument requires us to believe that Ray knew in 2004 that the mailbox rule would apply to a section 974.06 post-conviction motion filed in Wisconsin, even when the motion is not received by the state court — issues that we decide today as a matter of first impression. In 2004, the only circuit authority for applying the mailbox rule to statutorily toll AEDPA were the cases decided by the Ninth Circuit. E.g., Caldwell, 30 F.3d at 1203. By that time, however, the “diligence” requirement was also firmly established in that circuit’s law. E.g., Huizar, 273 F.3d at 1222. But Ray does not argue that he diligently followed up with the state court during the two years that passed from the time he allegedly gave Ms. Smith his motion to the time he filed his second, supplemental motion. We must also believe that Ray foresaw that neither Ms. Smith nor anyone else from the Diamondback Correctional Facility would testify at the inevitable evidentiary hearing — surely Ray would have known that Ms. Smith’s or another CCA official’s testimony contradicting his claims likely would have provided evidence to support the district court’s dismissal of his petition as untimely. All of this might in fact be true, but without evidence there is no basis for believing any of it.
There is no dispute that the district court placed the burden of proof on Ray. This was error. Our review of the record convinces us that the district court’s error was not limited to the law, however. The state did not submit any evidence to contradict Ray’s testimony and evidence. And it certainly did not carry its burden of proving that Ray’s federal habeas petition was untimely. Yet the district court found that Ray had concocted an elaborate scheme to defraud the court and subvert AEDPA’s limitations period, and it concluded that Ray’s federal habeas petition was untimely filed. This conclusion lacks an evidentiary basis. We have a “definite and firm conviction” that the district court made a mistake; its findings are clearly erroneous. See Harris v. Reed, 894 F.2d 871, 878 (7th Cir.1990) (finding clear error where the district court “constructed] a trial strategy supporting [petitioner’s] counsel’s decision” not to call material witnesses at the petitioner’s trial); Gorham, 760 F.2d at 795 (finding clear error in district court’s rejection of evidence related to the petitioner’s waiver of his Miranda rights because the state failed to “mention[ ] [the evidence] at the suppression hearing” during the petitioner’s trial). The dissent believes that we have “isolated each piece of evidence and then one by one concluded that the individual inconsistency or implausibility is insufficient by itself to support the district court’s factual findings” (post at 1023 n. 4), but all we have done is demonstrate how the district court discredited each piece of Ray’s evidence based not on proof from the state, but on speculation. Speculation piled on top of speculation does not a factual finding make; zero plus zero still equals zero.
Ray’s constitutional rights were violated during his criminal trial. There is no dispute about that. After we remanded this case to the district court to decide whether Ray’s federal habeas petition was untimely, the state had over one year from the time our mandate issued on April 13, 2010 until the evidentiary hearing. This was more than enough time for the state to cull together evidence sufficient to refute Ray’s claim and make a persuasive case for untimeliness. The state apparently “made numerous phone calls to ... other CCA prisons still operating in Oklahoma” but *1018 was met “with voicemails and unreturned calls for months.” It did “everything” it could think of “to get more information from CCA on ... their policies,” but was ultimately unsuccessful. So the state appeared at the evidentiary hearing with one witness, who could only speculate about whether Ray might have had postage in April 2004, and a prison mail policy that did not contradict Ray’s testimony about the issuance of receipts for outgoing mail. Without evidence, the state painted Ray as a “bright,” “sophisticated,” and experienced habeas litigant familiar with AED-PA’s one-year limitations period and the Houston mailbox rule’s applicability to a pro se prisoner’s purported filing that is not actually received by the court. Branded a liar, what was Ray to do? No amount of evidence could have overcome this hurdle. The district court sided with the state. But it did so only after incorrectly placing the burden of proof on Ray. We previously held that Ray’s constitutional rights were violated during his state court trial. So we now reverse the district court’s dismissal of Ray’s petition as untimely, reinstate the petition, and remand this case with instructions to grant the writ unless the state elects to retry him.
In concluding, we highlight an interesting irony in this case that we think is relevant to our decision to place the burden of proving untimeliness on the state. The state notes the difficulty it has had in obtaining evidence from and about CCA and Diamondback; it was met with unreturned messages for “months.” This is the state’s attorney’s office. Imagine the difficulty, and possible resistance, that a pro se prisoner will likely face under similar circumstances. To ignore this practical reality is to elevate form over substance, procedure over justice. Without a clear statutory command to that effect from AEDPA, and in light of the Supreme Court’s dictates in Houston, we reject the state’s request that we do so here.
III. CONCLUSION
For the above-stated reasons, we Reverse the district court’s dismissal of the petition for writ of habeas corpus, and Remand with instructions to grant the writ unless the state elects to retry the petitioner within 120 days of issuance of our final mandate or of the Supreme Court’s final mandate.

. Rule 4 "enables the district court to dismiss a petition summarily, without reviewing the record at all, if it determines that the petition and any attached exhibits either fail to state a claim or are factually frivolous.” Small v. Endicott, 998 F.2d 411, 414 (7th Cir.1993). Under this procedure, the government might not learn about the petition until a certificate of appealability is granted.

. "CCA” refers to Corrections Corporation of America.

. Ray has not invoked the doctrine of equitable tolling, which can toll AEDPA's one-year statute of limitations period, but demands that the petitioner demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.” Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005). The "threshold necessary to trigger equitable tolling is very high” and the doctrine applies only when "extraordinary circumstances” outside of the petitioner's control prevent timely filing. United States v. Marcello, 212 F.3d 1005, 1010 (7th Cir.2000). "Equitable tolling ... asks whether federal courts may excuse a petitioner’s failure to comply with federal timing rules, an inquiry that does not implicate a state court's interpretation of state law.” Holland v. Florida, — U.S. -, 130 S.Ct. 2549, 2563, 177 L.Ed.2d 130 (2010).

. The dissent asserts that Ray’s testimony about postage was “inconsistent” with Ray’s affidavit attached to his habeas petition, and that this somehow meant that Ms. Highley's testimony "supported the district court's factual findings.” (Post at 1025.) But the assertion in Ray's affidavit that he gave Ms. Smith a disbursement request is not at all inconsistent with Ray’s testimony that he gave Ms. Smith a disbursement request and used stamps as postage. In any event, Ms. Highley's testimony simply doesn’t support the district court’s factual findings as discussed above.